UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 21-177 |
| v. | * | SECTION: "B" |
| SEAN MARTIN, et. al | * | |
| | * * * | |

GOVERNMENT'S MOTION *IN LIMINE* TO INTRODUCE
EVIDENCE IMPLICATING COCONSPIRATORS
AND INCORPORATED MEMORANDUM IN SUPPORT

**NOW INTO COURT**, through the undersigned Assistant United States Attorney, comes

the United States of America and files the Government's Motion *in Limine* to Introduce Evidence

Implicating Coconspirators and Incorporated Memorandum in Support.  For the reasons discussed

below, this evidence should be admitted at trial.

**BACKGROUND**

The Indictment charges that "Sean Martin, Sean Esprit, and Gene Jackson combined,

conspired, confederated, and agreed with each other, *and with other persons known and unknown*

to the Grand Jury, to distribute and to possess with the intent to distribute" heroin, fentanyl, and

cocaine.  Rec. Doc. 1 (emphasis added).  The government intends to put on evidence related to

these unindicted co-conspirators at trial.

An example helps to explain what the government plans to do.  On November 19, 2019, at

approximately 11:15 a.m., federal agents executed a sealed search warrant at Sean Esprit's

apartment at the Esplanade at City Park apartments.  They found over a kilogram of heroin, over

400 grams of fentanyl, a quantity of cocaine, $2,000 in cash, and a loaded 9mm pistol hidden in a

drop ceiling.  These items underlie Counts 2-4 of the Indictment.  Esprit has pleaded guilty to

possessing the drugs with the intent to distribute and possessing the firearm in furtherance of drug

trafficking with a factual basis stating that he "exercised knowing joint constructive possession of the gun and drugs." Rec. Doc. 86 at 5. The government intends to prove that Martin also had joint constructive possession of these same items and was conspiring with Esprit and others.

As part of its proof, the government will show that shortly after the search Esprit called Martin on a phone that was not the one the government was intercepting pursuant to the Title III authority. Martin was on with another person on the phone that was being tapped when Esprit called Martin's other phone. Martin's side of the conversation on the other phone can be heard over the phone that was being tapped because Martin did not hang up the call when Esprit called his other phone. Martin said, in sum and substance, "What people?," "They left a note for you?," "You said it was the police?," "Sean!," and "Did someone come to the office and get permission to go in there?" Based on Martin's side of the conversation, which is animated, it is obvious that Esprit told him someone had come to the apartment and taken the drugs, cash, and gun.

Agents understood that searching the apartment was likely to create a stir and were eager to monitor the reaction. This strategy of taking an investigation step that is likely to cause the targets to react is colloquially referred to as "tickling the wire." The above call between Esprit and Martin on Martin's other phone (*i.e.*, not the phone being tapped) occurred at 12:22 p.m., a little more than an hour after the DEA executed the search warrant at the apartment. Agents were closely monitoring how Martin, Esprit, and their co-conspirators reacted to the search.

By this point in the investigation, the agents had identified 1330 Kerelec Street in New Orleans as a hangout spot for Martin and several of his co-conspirators. The DEA had a pole camera up monitoring the location and regularly saw Martin, Esprit, C.J., W.R., N.C. R.W., and others interacting at the house. On the day of the search, agents were monitoring the pole camera. At 12:59 p.m., R.W. and C.J. arrived in R.W.'s vehicle. Four minutes later, at 1:03 p.m., Esprit

arrived.  Three minutes after that, at 1:06 p.m., Martin arrived.  At 1:09 p.m., Esprit and Martin exited the residence and sat on the stoop talking for about ten minutes.  Martin then left in his vehicle at 1:23 p.m. and Esprit and R.W., who had come outside, went back inside.  R.W. and C.J. left at around 1:26 p.m.  At approximately 1:34 p.m., R.J., who agents suspect to be Martin's source, arrived and entered the residence.  Around 2:00 p.m., C.J. returned in his own vehicle, and C.J. and Esprit sat and spoke on the stoop.  At approximately 2:03 p.m., R.W. returned in his vehicle carrying a white plastic bag.  At 2:05 p.m., Esprit went inside, and R.J. came out and sat with C.J. for four minutes before both went back inside.  At 2:20 p.m., Martin returned and was greeted by R.J.  At 2:26 p.m., N.C., who is charged with drug trafficking in E.D. La. Case No. 21-168, arrived and greeted Esprit, who was sitting outside, before entering the house.  At 2:30 p.m., Martin exited the residence and sat with Esprit on the stoop and talked.  During the conversation, it appeared that Esprit referenced with his hands something overhead several times.  (The drugs were found in a ceiling tile.)  That conversation lasted about six minutes.  Around 2:45 p.m., W.R. and N.C. exited the house with W.R. carrying a bag.  They went to N.C.'s truck, where they remained for a moment before they returned to the residence without the bag.

The timing of these interactions at the Kerelec residence by itself is highly suggestive of criminality.  It makes perfect sense that a group of men who were distributing narcotics together and who were extremely careful on their phones would meet in person to discuss what to make of the fact that someone had come into Esprit's apartment and taken the drugs and what that meant for their ongoing drug trafficking activity.  But it is not just the timing that is suggestive of criminality.  Martin, C.J., R.J., N.C., and W.R. all have prior federal drug trafficking convictions. They were all routinely around the Kelerec residence together.  At times, Martin and C.J. would leave the group and go talked just the two of them at a nearby stoop.  C.J. and N.C., with the

assistance of R.W. and W.R., would exchange packages and put things in or get things out of each other's cars.  On one occasion in early July 2019, agents observed N.C. trying unsuccessfully to get something out of C.J.'s car.  N.C. then walked over and talked to C.J., who was motioning consistent with explaining how to get an item from under the seat of the car.  N.C. returned to the car and got an item, which he then put down the front of his pants.  Agents had police stop N.C. when he drove off, and they found 14 grams of heroin down his pants and $9,000 in his car.

In addition to the meeting at the Kerelec residence after the search, there are other instances of surveillances in which agents observed Martin briefly meeting with a coconspirator in a vehicle to consummate drug transactions.  These episodes are akin to the November 13, 2019 meeting between Jackson and Martin.[1]  For example, on October 28, 2019, Martin arranged to meet with N.W. and then was observed meeting with N.W. briefly.  Following the meeting with Martin, agents surveilled N.W. as he then traveled to Metairie, where an unidentified female left a restaurant, got in N.W.'s vehicle in the parking lot for a short time, and then returned to the restaurant.  The government intends to present this episode as showing Martin selling N.W. heroin, and N.W. in turn selling it to a drug user in Metairie.  Later that day, NOPD stopped N.W. at the agents' request to identify him.  After having identified him, police ran a criminal history check and learned that N.W. had multiple prior drug trafficking convictions, including a federal drug trafficking conviction.

## LAW AND ARGUMENT

The activity described above—a meeting with a coconspirator to consummate a drug

---

[1] To refresh the Court's memory, on November 13, 2019, Martin called Jackson, asked him where he was at with it, and arranged to meet him at "mom's."  Right after the call, Martin went in Esprit's apartment for 5 to 10 minutes.  He then drove to meet Jackson at "mom's" and met with Jackson for a few minutes in his vehicle.  Just after Jackson met with Martin, Jackson texted his drug customers that he had "food," which is slang for heroin.  Jackson was pulled over and had about two ounces of heroin.  This episode underlies Count 6, which charges Jackson with PWITD.

transaction and a meeting among many coconspirators to discuss the implications of the stash at Esprit's apartment being taken—is part of the charged conspiracy.  The other participants in the transactions and the post-search meeting are uncharged co-conspirators.  Martin's interactions with these individuals are direct proof of the conspiracy.

The government anticipates an argument from the defense that the above-described evidence shows nothing more than innocent interactions.  The government can hear an argument that there is nothing criminal about two people meeting in a car, nor anything improper about a group of friends getting together at a house, even if was right after the federal government executed a surreptitious search warrant and seized a large amount of drugs, cash, and a gun.

In the context of a conspiracy charge, evidence about a defendant's co-conspirators' actions is often highly relevant. *See, e.g.*, *United States v. Ocampo-Vergara*, 857 F.3d 303, 307–08 (5th Cir. 2017).  "[T]he agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the development and collation of circumstances," including evidence about the defendant's "presence and association with other members of a conspiracy." *Id*. (internal quotation marks and citations omitted).  Accordingly, the Fifth Circuit has held that evidence about an associate's guilt is admissible if it has some tendency to establish the elements of a conspiracy against the defendant himself. *See, e.g.*, *United States v. Portillo*, 969 F.3d 144, 178 (5th Cir. 2020) (convictions of other Bandidos gang members relevant to countering defendant's argument that the gang was no longer criminal under his leadership); *United States v. Chavful*, 100 F. App'x 226, 231 (5th Cir. 2004) (admitting gang letter where it was "probative of [defendant's] association with other members of the conspiracy"); *see also, e.g.*, *United States v. Rodriguez*, 162 F.3d 135, 143 (1st Cir. 1998) (Evidence of associates' criminal activity admissible to counter defendant's argument "that he was not a co-conspirator, but a friend

of Rodríguez's with the misfortune of continually being in the wrong place at the wrong time when drugs were present.").

*Ocampo-Vergara* is particularly instructive in delineating impermissible "guilt by association" evidence from highly relevant evidence that a defendant was involved with coconspirators. Such testimony is impermissible when the evidence is introduced to show "*only that a defendant associates with unsavory characters.*" *Ocampo-Vergara*, 857 F.3d at 308 (emphasis in original) (citing and describing *United States v. Polasek*, 162 F.3d 878, 884 (5th Cir. 1998), as "instructive of the interaction between conspiracy cases and the prohibition on guilt-by-association evidence"). The testimony in *Polasek*, which involved government questioning about other individuals who had committed odometer fraud with whom the defendant had had business interactions, was problematic because "[t]he government never demonstrated that [the defendant] participated in or even knew of the schemes for which the associates were convicted." *Id.* (citing *Polasek*, 162 F.3d at 884 n.2). "In contrast, where the defendant's offense is connected to others' conduct, no such problems arise." *Ocampo-Vergara*, 857 F.3d at 308.

The government is well aware that it is impressible to attempt to show the defendant's guilt through his association with unsavory characters. There are numerous Fifth Circuit cases holding that "guilt by association" evidence should be excluded as irrelevant and unduly prejudicial. *See*, *e.g.*, *Polasek*, 162 F.3d at 884; *United States v. Parada–Talamantes*, 32 F.3d 168, 170 (5th Cir. 1994); *United States v. Romo*, 669 F.2d 285, 288 (5th Cir. 1982); *United States v. Singleterry*, 646 F.2d 1014, 1018 (5th Cir. 1981); *United States v. Forrest*, 620 F.2d 446, 451 (5th Cir. 1980). But those cases involve instances in which the government showed no more than that "one is married to, associated with, or in the company of a criminal." *Forrest*, 620 F.2d at 451. The problem there

is that a person having a spouse or brother who is a criminal does not support an inference that that person is himself a criminal or shares the criminal's guilty knowledge.

But here, the government is not trying to argue that Martin is guilty because all his friends have federal drug trafficking convictions, which would of course be improper "guilt by association" evidence. Rather, the government wants to show that Martin was meeting with N.W. because he was selling N.W. drugs, and the government's understanding of that meeting is bolstered by the fact that N.W. has several prior drug trafficking convictions, including a federal one. The relevance of those convictions is not improper "guilt by association" inferences but a means to rebut Martin's argument that his brief meeting with N.W. in a car was wholly innocent. Similarly, the government wants to show that Martin was meeting with key drug associates right after the search at Esprit's apartment because those were the men who needed to decide what to do in response to the stash being hit. To rebut the notion that the meeting was somehow just friends hanging out, the government wants to introduce evidence of some of those same men conducting drug transactions at that same house just months before the search. The government also wants to introduce the fact that these men who were themselves conducting drug transactions and who were meeting with Martin and Esprit after the search all have federal drug trafficking convictions. The relevance is not that Martin has shady friends, but rather that Martin conspires with men who also have drug convictions, undermining his defense that the meetings are innocent.

A careful review of the relevant case law shows that the government's plan falls on the allowable side of association evidence. Pole camera footage shows Martin meeting with C.J., N.C., and other members of the conspiracy directly after Martin learned that someone had taken the drugs, cash, and gun stashed at his son's apartment. These are not just people Martin knows who happen to have criminal records. These are his coconspirators with whom he is meeting to

discuss the implications of a major development that threatens their drug trafficking activity.  To counter Martin's suggestion that the meeting was innocent in nature, the government should be allowed to introduce evidence that C.J. and N.C. have prior federal drug trafficking convictions and repeatedly met to exchanges packages at the same house where they all just so happened to meet up after the search at Martin's son's apartment.

Similarly, the government intends to argue to the jury that when agents observed Martin meet briefly with various people, often in conjunction with intercepted calls setting up meetings, that those meetings were Martin providing the other people with drugs.  It is not that Martin just so happened to be friends with people with drug trafficking convictions.  It is that he was meeting with those people to do drug deals and the fact that they have prior drug trafficking convictions is relevant to showing that those meetings were in fact drug deals and not just innocent meetings.  Accordingly, the government's evidence as to Martin's coconspirators does not raise an issue of "guilt-by-association" because it does not "indicate[] *only* that [he] associates with unsavory characters."  *Ocampo-Vergara*, 857 F.3d at 308 (emphasis in original).  Rather, it establishes that Martin's drug-trafficking offenses are "connected to" his coconspirators' conduct, which the Fifth Circuit has held presents "no such problem[]."  *Id.*

As explained in *Ocampo-Vergara* and *Portillo*, proving a conspiracy charge often involves building a case for the defendant's guilty knowledge and participation in the conspiracy through circumstantial evidence.  *See also United States v. Gallardo-Trapero*, 185 F.3d 307, 317 (5th Cir. 1999) ("[I]n meeting its burden, the government may rely on circumstantial evidence tying the defendants together in order to prove conspiracy.").  Cryptic calls.  Meetings that are short in nature.  Meetings at locations where drugs are being distributed.  Meetings following key events.  Solo visits to places where drugs are stashed.  Association with individuals distributing drugs.  All

this evidence constitutes building blocks in the government's case.  It is not impermissible "guilt by association" evidence, but rather direct evidence of the defendant conspiring with others.

For the foregoing reasons and authorities, the government should be allowed to present evidence of the criminal activities of Martin's coconspirators, including their drug trafficking activity and their prior drug trafficking convictions.

Respectfully submitted,

DUANE A. EVANS
UNITED STATES ATTORNEY


/s/ David Haller
DAVID HALLER
Assistant United States Attorney
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3117


**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ David Haller
DAVID HALLER
Assistant United States Attorney